UNDER SEAL

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:13-CR-00444-BR |
| v. | INDICTMENT<br>[UNDER SEAL] |
| LLOYD BENTON SHARP, aka Kevin Thomas and JACK HOLDEN, | 18 U.S.C. § 1349<br>18 U.S.C. § 1343<br>18 U.S.C. § 1341 |
| Defendants. | 18 U.S.C. § 1957<br>18 U.S.C. § 1956(h)<br>18 U.S.C. § 981(a)(1)(C)<br>28 U.S.C. § 2461(c) |

THE GRAND JURY CHARGES:

## COUNT 1
## CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD
## [18 U.S.C. § 1349]

I.    INTRODUCTION

At all times material and relevant to this Indictment:

A.    **The Individuals.**

1.    Defendant **LLOYD BENTON SHARP**, aka Kevin Thomas, was at times a resident of Oregon and Nevada. Defendant **SHARP** was the founder and Chief Executive Officer (CEO) of an entity called Club 120 Holding, also known as Club CXX Holding, Inc. (hereinafter referred to as Club 120 Holding). **SHARP**, using his alias Kevin Thomas, also formed and was president of an Oregon non-profit religious corporation called Clean Energy Association. **SHARP** is an authorized signatory on Bank of America account number X8034 in the name of Clean Energy Association, an account into which investor funds were deposited.

SHARP was also associated with an entity called AAG Enterprises, aka AAG Enterprises, Inc. and AAG Holding, Inc., an Oregon non-profit religious corporation. SHARP was an authorized signatory on U.S. Bank account No. X5649 in the name of AAG Enterprises, an account into which investor funds were deposited. Defendant SHARP and co-defendant JACK HOLDEN used Club 120 Holding, AAG Enterprises, and Clean Energy Association to solicit investment funds for: (1) a project that was supposed to produce and sell biodiesel fuel in the West African nation of Ghana; and (2) a related project that was supposed to transport biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile.

2. Defendant JACK HOLDEN was at times, a resident of Oregon, and of the West African nation of Ghana. Defendant HOLDEN is a self-described "successful serial entrepreneur", and is the Executive Director of Goldstar Farms, Ltd., a company in Ghana. HOLDEN was also the manager of Gold Star Bio-Diesel LLC, an Illinois domestic limited liability company. HOLDEN and co-defendant SHARP solicited investment funds for: (1) a project that was supposed to produce and sell biodiesel fuel in the West African nation of Ghana, and (2) a related project that was supposed to transport biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile.

B. The Entities.

3. Gold Star Bio-Diesel LLC was formed as an Illinois Domestic Limited Liability Company on March 7, 2008. Defendant JACK HOLDEN was listed as Manager, and H. M. O. was listed as agent. Defendant HOLDEN was a signatory on Bank of America account No. X2701 in the name of Gold Star Bio-Diesel LLC and on J.P. Morgan Chase account No. X0784 in the name of Gold Star Bio-Diesel LLC. Investor funds were deposited to both of these accounts.

4. Goldstar Farms Ltd., hereinafter referred to as Goldstar Farms, is a company in Ghana, West Africa. According to the company's website, at www.goldstarfarms.com, Goldstar Farms is a "vertically integrated" company that grows renewable feedstock, extracts oils from the seeds of the fruit on jatropha trees, refines the oil into biodiesel, and pumps the biodiesel to fuel tanks around the world. Included in the Goldstar Farms Ltd. family of companies are Gold Star Biofuels, Gold Star Biodiesel, Gold Star Bio-Diesel LLC, Gold Star Ltd., and Gold Star Refineries Ltd and Gold Star Refinery #3 Ltd. Defendant **JACK HOLDEN** is the Executive Director of Goldstar Farms, Ltd. and the Manager of Gold Star Bio-Diesel LLC. Diana Holden, aka Lady D, defendant **JACK HOLDEN'S** wife, is the Managing Director of Goldstar Farms Ltd.

5. AAG Enterprises, aka AAG Enterprises, Inc., and AAG Holding, Inc., was formed as an Oregon non-profit religious corporation on June 26, 2001. Its registered agent was listed as South Beach Missions, 15113 S. Maple Lane Road, Oregon City, Oregon 97045. Defendants **SHARP** and **HOLDEN** used AAG Enterprises to solicit investment funds in the Ghana biodiesel fuel project. Defendant **SHARP** is listed as an authorized signatory on U.S. Bank account No. X5649 in the name of AAG Enterprises, an account into which investor funds were deposited.

6. Club 120 Holding, also known as Club 120 Holding Inc., Club 120 Resort Living, Club CXX Holdings, Inc., was founded by defendant **SHARP**. He is the Chief Executive Officer. Defendants **SHARP** and **HOLDEN** used Club 120 Holding as part of their efforts to solicit investments for the project to produce and sell biodiesel fuel in Ghana.

7. Clean Energy Association was formed as an Oregon non-profit religious corporation on September 10, 2008. Defendant **SHARP**, using his alias Kevin Thomas, is

President and Marilyn Sharp, aka Maril Fitzgerald, defendant **SHARP'S** wife, is Secretary. Its principal place of business is 15113 S. Maple Lane Road, Oregon City, Oregon 97045, the same address as AAG Enterprises. Defendants **SHARP** and **HOLDEN** used Clean Energy Association as part of their efforts to solicit investments for: (1) the project to produce and sell biodiesel fuel in Ghana, and (2) a related project that was supposed to transport biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile. **SHARP** is an authorized signatory on Bank of America account No. X8034 in the name of Clean Energy Association into which investor funds were deposited.

## II. OBJECTS OF THE CONSPIRACY

8. Beginning in or about July 2007, and continuing to the date of this Indictment, in the District of Oregon and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, conspired and agreed, together with others known and unknown to the Grand Jury, to commit the following offenses, in violation of Title 18, United States Code, Section 1349:

>   a. Mail Fraud – To knowingly and willfully use or cause the use of the United States mails or private or commercial interstate carrier in furtherance and execution of a material scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341;

>   b. Wire Fraud – To knowingly and willfully transmit or cause to be transmitted by wire communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds in furtherance and execution of a material scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

## III. THE CONSPIRACY

9. The purpose of the defendants' conspiracy was twofold: (1) to defraud investors who were told they were investing in a project to produce and sell biodiesel fuel in Ghana; and (2) when this investment failed, to continue to defraud those same investors by soliciting additional funds for a project to transport existing biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile.

10. It was part of the conspiracy that on or about July 3, 2007, defendant **SHARP**, using his alias Kevin Thomas and acting on behalf of Club 120 Holding, Inc., and defendant **HOLDEN**, acting on behalf of Gold Star Farms Ltd., entered into a Joint Venture Agreement, wherein Club 120 Holding, Inc., and Gold Star Farms, Ltd. agreed to form a limited liability company in Ghana, West Africa called Gold Star Refinery #3 Ltd. to build and operate a biodiesel refinery. As part of the Joint Venture Agreement, Club 120 Holding agreed to contribute $350,000.00 toward the purchase and operation of the refinery, and Gold Star agreed to provide the land in Ghana to locate the refinery, train personnel to operate the refinery, and provide the initial supplies and feedstock to run the factory for the first 30 days. Club 120 Holding was to receive 49% of the shares of Gold Star Refinery #3 Ltd. and 50% of the net profit from the sale of biodiesel produced. Gold Star Farms Ltd. was to retain 51% of the shares of Gold Star Refinery #3 Ltd. and the balance of the net profits from the sale of the biodiesel.

11. It was part of the conspiracy that on or about October 14, 2007, defendant **SHARP**, using his alias Kevin Thomas and acting on behalf of AAG Enterprises, Inc., and defendant **HOLDEN**, acting on behalf of Gold Star Ltd., entered into a Joint Venture agreement, wherein AAG Enterprises, Inc. and Gold Star Ltd. agreed to form a limited liability company in Ghana, West Africa called Gold Star Refinery #3 Ltd. to build and operate a biodiesel refinery.

As part of the Joint Venture agreement, AAG Enterprises, Inc. agreed to contribute $350,000.00 toward the purchase and operation of the refinery, and Gold Star Ltd. agreed to provide the land in Ghana to locate the refinery, train personnel to operate the refinery, and initial supplies and feedstock to run the factory for the first 30 days. AAG Enterprises, Inc. was to receive 49% of the shares of Gold Star Refinery #3 Ltd. and 50% of the net profit from the sale of biodiesel produced. Gold Star Ltd. was to retain 51% of the shares of Gold Star Refinery #3 Ltd. and the balance of the net profits from the sale of the biodiesel.

12. It was part of the conspiracy that in or about Fall 2007, defendants **SHARP** and **HOLDEN** held meetings in the District of Oregon with investors and potential investors to solicit investment funds for a project to produce and sell biodiesel fuel in Ghana, West Africa.

13. It was part of the conspiracy that defendants **SHARP** and **HOLDEN**, among other things, told the investors the following: (1) that **HOLDEN** was the "idea man" and **SHARP** was the "money man"; (2) that **HOLDEN** had 5 million acres of land in Ghana that was under contract with local tribes to grow jatropha trees, and that the seeds of the jatropha fruit would be refined into biodiesel fuel; (3) that **HOLDEN** had a large supply of jatropha seeds, and all he needed was $350,000.00 to get the operation up and running; (4) that they would buy a prefabricated refinery that would be shipped to Ghana, and able to produce biodiesel fuel immediately; (5) that **HOLDEN** was sending his engineer, S.S., to ensure that the refinery was set up and running smoothly; and (6) that **HOLDEN** had signed contracts with bus companies in Ghana to buy all the biodiesel they could produce.

14. It was part of the conspiracy that defendant **SHARP** told investors that as part of the investment, they would actually be purchasing shares of his company Club 120 Holding, that **SHARP** would own 50% of Club 120 Holding, and that the investors would own the other 50%.

15. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** falsely told investors that the refinery would be up and running within two months of receiving the $350,000.00 of investment funds.

16. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** falsely told investors that if they each made a $50,000.00 investment, they would each receive a return of $7,000.00 per month for an indefinite period of time as soon as the biodiesel refinery was operational.

17. Both defendants falsely told investors that their investment funds would be used to purchase the equipment, feedstock, and to bring in **HOLDEN'S** engineer to operate the refinery. Both **SHARP** and **HOLDEN** reiterated that all they needed was $350,000.00 to make it happen. Defendants **SHARP** and **HOLDEN** told investors that the return of $7,000.00 per month was realistic based on the cost of production and the amount they could sell the biodiesel for. Both **SHARP** and **HOLDEN** told investors that their making the investment was a "no-brainer."

18. It was part of the conspiracy that defendant **SHARP** would falsely guarantee the safety of the investors' money. Defendant **SHARP** falsely told investors that at any time, they could get 100% of their money back. **SHARP** stated that he could guarantee the return of 100% of the investors' money, because he was involved many profitable ventures, including gold investments, and that several of these investments would produce millions of dollar for him.

19. It was part of the conspiracy that defendants made statements about Christianity, God, and religion that were designed to make the investors feel more secure and less skeptical about the representations made regarding the biodiesel investment scheme.

20. It was part of the conspiracy that in order to induce investors to invest in the project to produce and sell biodiesel in Ghana, defendants claimed to be "good Christians." **HOLDEN** claimed to have been a former Christian missionary and a pastor, and stated to potential investors that **SHARP** had been a member of his congregation and was a good "tither." **HOLDEN** also told investors that, "God was going to bless the project."

21. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** knowingly and willfully failed to truthfully and accurately disclose, and omitted to state certain material facts to investors to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to the following :

  a. that in 1984, the U.S. District Court in the District of Oregon issued a permanent injunction barring defendant **SHARP** from selling securities;

  b. that in 1988, the State of Indiana Office of Secretary of State, Securities Division, issued a Cease and Desist Order barring defendant **SHARP** from offering and selling unregistered securities;

  c. that in 1989 the Arizona Corporation Commission issued a Cease and Desist Order barring defendant **SHARP** from selling unregistered securities;

  d. that defendant **SHARP** had previously been convicted in Arizona in 1989 of Operating a Fraudulent Schemes and Artifices, Sale of Unregistered Securities, Sale of Securities by Unregistered Salesman, and Illegally Conducting an Enterprise;

  e. that defendant **SHARP** had previously been convicted in 1991 of Mail Fraud and Aiding and Abetting;

  f. that in 1991, the U.S. District Court in the District of Nevada issued a permanent injunction barring defendant **SHARP** from selling "ore purchase contracts";

  g. that in 1992, defendant **HOLDEN** had been convicted in the District of Oregon of Wire Fraud, Interstate Transportation of Stolen Property, and Money Laundering;

  h. that in 2003, the Texas State Securities Board issued an Emergency Cease and Desist Order barring defendant **SHARP** from acting as a securities dealer and from offering securities for sale;

  i. that in 2003, the U.S. District Court for the Western District of Washington issued a permanent injunction barring defendant **SHARP** from selling unregistered securities and ordered him to pay a civil penalty of $120,000.00 for the sale of unregistered securities to the public;

22. It was part of the conspiracy that based on defendants' false pretenses, representations, promises, and omissions of material facts, investors invested substantial funds in the defendants' projects to: (1) produce and sell biodiesel fuel in Ghana, and (2) transport biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile.

23. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** did not use the investors' funds to produce and sell biodiesel fuel in Ghana as promised.

24. It was part of the conspiracy that the Ghana biodiesel refinery would never become operational and that defendants **SHARP** and **HOLDEN** would fail to produce and sell biodiesel as promised.

25. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** failed to provide the promised return on investment of $7,000.00 per month per $50,000.000 invested by each of the investors.

26. It was part of the conspiracy that contrary to the promises made by defendants **SHARP** and **HOLDEN**, they failed to return 100% of the investors' funds when requested. In fact, they returned little, if any, investment money to the investors.

27. It was part of the conspiracy that when asked by investors why the Ghana refinery was not operational, defendants **SHARP** and **HOLDEN** represented to investors that the Ghana refinery project was underfunded, that a more promising investment opportunity had been found in Chile, and that a successful investment in Chile would provide sufficient funds to get the Ghana refinery operational.

28. It was part of the conspiracy that in Fall 2008, defendant **SHARP** solicited and received from investor R.S., $100,000.00 in additional funds for an investment in five biodiesel plants in Chile. In return, **SHARP** falsely promised that investor R.S. would receive a return of his principal, along with 40% interest, in one year, and a 50/50 split of the profits made by the five biodiesel plants. **SHARP** falsely told investor R.S. that he (**SHARP**) would use the investment funds to purchase a certificate of deposit in the amount of $100,000.00, and that he (**SHARP**) would use the certificate of deposit as collateral for a $100,000.00 loan he (**SHARP**) would obtain from Bank of America to finance the project. Investor R.S. made this investment based upon **SHARP**'s false representations. Investor R.S. never received his principal or any return on his investment.

29. It was part of the conspiracy that between approximately Summer 2008 and December 2008, defendants **SHARP** and **HOLDEN** told investors that **HOLDEN**, acting on

behalf of his company Gold Star, entered into a contract with a power-generating company located in Degan, Chile, to deliver $900 million worth of biodiesel fuel over a six-year period. Initially, the defendants falsely represented that this biodiesel fuel would be provided by refineries that the defendant operated in Chile. Later, when it was apparent that the defendants had no refineries in Chile, the defendants falsely represented that this biodiesel would be obtained in Argentina and shipped via truck tankers, to Chile.

30. It was part of the conspiracy that between approximately November 2008 and approximately March 2009, **SHARP** and **HOLDEN** falsely represented to investors that a supplier for the biodiesel in Argentina had already been secured, that tanker trucks to transport the biodiesel were ready, and all that was needed was $100,000.00 cash to get the operation going.

31. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** falsely promised investors that if they invested $100,000.00 to fund the transportation of biodiesel from Argentina to Chile, they would double their investment money and receive a return of funds within 120 days.

32. It was part of the conspiracy that **SHARP** and **HOLDEN** falsely represented to investors that the cash generated from the sale of the biodiesel fuel to the Chilean power-generating plant would be sufficient to pay the investors back and to fund the completion of the Ghana biodiesel refinery operation.

33. It was part of the conspiracy that contrary to defendants' promises and representations to the investors, defendants **SHARP** and **HOLDEN** never purchased biodiesel in Argentina, and never delivered biodiesel to the Chilean power-generating company.

34. It was also part of the conspiracy that defendants **SHARP** and **HOLDEN** never provided investors with their promised return on investment or their principal invested in the project to purchase and transport biodiesel from Argentina to Chile.

35. It was further part of the conspiracy that contrary to defendants' promises and representations to investors, defendants **SHARP** and **HOLDEN** never used the supposed profits from the sale of biodiesel fuel to the Chilean power-generating plant to get the Ghana biodiesel refinery operating.

36. It was part of the conspiracy that defendants **SHARP** and **HOLDEN** would use a large portion of the funds from investors in the project to produce and sell biodiesel fuel in Ghana, and from investors in the project to transport biodiesel from Argentina to Chile for their personal benefit.

## IV. OVERT ACTS

37. In furtherance of the conspiracy, and to promote the objects thereof, defendant **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, and other persons known and unknown to the grand jury, committed and caused to be committed, among others, the interstate wire transfers of funds set forth in Counts 2 through 7 of this Indictment, incorporated herein by this reference.

38. In furtherance of the conspiracy, and to promote the objects thereof, defendant **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, and other persons known and unknown to the grand jury, committed and caused to be committed, among others, sent materials via the U.S. Postal Service set forth in Counts 8 through 10 of this Indictment, incorporated herein by this reference.

All in violation of Title 18, United States Code, Section 1349.

# COUNTS 2 THROUGH 7
# WIRE FRAUD
# [18 U.S.C. § 1343]

1. The Grand Jury re-alleges each and every allegation contained in each of the paragraphs of Count 1 of this Indictment, and incorporates them by reference as if fully set forth herein.

Between in or about July 2007 and the date of this Indictment, in the District of Oregon and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, together with persons known and unknown to the Grand Jury, did knowingly and intentionally devise and intend to devise a material scheme and artifice to defraud investors in a biodiesel fuel project in Ghana, and in a related project to transport existing biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile, and to obtain money and property of those investors by means of materially false and fraudulent pretenses, representations, and promises, and through omissions of material facts. The material scheme and artifice to defraud is more particularly set forth in each of the paragraphs of Count 1 of this Indictment, and are incorporated herein by this reference.

2. On or about the dates set forth below, in the District of Oregon and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, aided and abetted by one another, together with others known and unknown to the Grand Jury, for the purposes of executing the aforementioned material scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted in interstate commerce by means of wire communications, signals, and sounds, that is, wire transfers of money across state lines, as set forth below, each such use of the wires being a separate count of this Indictment:

| COUNT | DATE | ORIGINATION | DESTINATION | DESCRIPTION OF WIRE |
|---|---|---|---|---|
| 2 | 10/17/2008 | OREGON | ILLINOIS | Wire Transfer of $80,000.00 from Bailey Hill Family Dental Center PC to Gold Star Bio-Diesel LLC. |
| 3 | 11/10/2008 | OREGON | ILLINOIS | Wire Transfer of $215,000.00 from Bank and Vogue Limited to Gold Star Bio-Diesel LLC. |
| 4 | 12/30/2008 | OREGON | ILLINOIS | Wire Transfer of $35,000.00 from Professional Consulting Services, Inc. to Gold Star Bio-Diesel LLC. |
| 5 | 03/09/2009 | OREGON | ILLINOIS | Wire Transfer of $100,000.00 from T.D. to Gold Star Bio-Diesel LLC. |
| 6 | 03/10/2009 | OREGON | ILLINOIS | Wire Transfer of $25,000.00 from R.B. to Gold Star Bio-Diesel LLC. |
| 7 | 05/18/2009 | OREGON | ILLINOIS | Wire Transfer of $10,000.00 from T.D. to Gold Star Bio-Diesel LLC. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

/ / /

/ / /

/ / /

/ / /

# COUNTS 8 THROUGH 10
# MAIL FRAUD
# [18 U.S.C. § 1341]

1. The Grand Jury re-alleges each and every allegation contained in each of the paragraphs of Counts 1 through 7 of this Indictment, and incorporates them by reference as if fully set forth herein.

2. Between in or about July 2007 and the date of this Indictment, in the District of Oregon and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, together with persons known and unknown to the Grand Jury, did knowingly and intentionally devise and intend to devise a material scheme and artifice to defraud investors in a biodiesel fuel project in Ghana, and in a related project to transport existing biodiesel fuel from Argentina to Chile, and build biodiesel refineries in Chile, and to obtain money and property of those investors by means of materially false and fraudulent pretenses, representations, and promises, and through omissions of material facts. The material scheme and artifice to defraud is more particularly set forth in each of the paragraphs of Counts 1 through 7 of this Indictment, and are incorporated herein by this reference.

3. On or about the dates set forth below, in the District of Oregon, and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, aided and abetted by one another, and others known and unknown to the Grand Jury, for the purpose of executing the aforementioned material scheme and artifice to defraud, and attempting to do so, knowingly caused to be sent and delivered by the United States Postal Service according to the directions thereon, the items listed below, each of which constitutes a representative sample of the use of the mails in furtherance of the material scheme and artifice to defraud, and each such use of the mails being a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION OF ITEM MAILED |
|---|---|---|
| 8 | 11/26/2008 | Bank of America Certificate of Deposit receipt mailed to West Linn, Oregon. |
| 9 | 12/29/2008 | Joint Venture Agreement mailed from Oregon to Illinois. |
| 10 | 03/11/2009 | Joint Venture Agreement mailed from Lake Oswego, Oregon to West Linn, Oregon. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 11 THROUGH 16
## ENGAGING IN MONETARY TRANSACTIONS WITH CRIMINALLY DERIVED PROPERTY
## [18 U.S.C. § 1957]

1. The Grand Jury re-alleges each and every allegation contained in each of the paragraphs of Counts 1 through 10 of this Indictment, and incorporates them by reference as if fully set forth herein.

2. On or about the dates listed below, in the District of Oregon and elsewhere, the defendants set forth below with respect to each count, together with others known and unknown to the grand jury, did knowingly engage in and attempt to engage in monetary transactions by, through, or to a financial institution affecting interstate or foreign commerce, with criminally derived property of a value greater than $10,000.00, that is the purchase of cashier's checks, the making of wire transfers, and the withdrawal of cash from bank accounts on the dates listed below, such property having been derived from specified unlawful activity, that is the material mail and wire fraud scheme described in Counts 1 through 10 of this Indictment, each such monetary transaction being a separate count of this Indictment:

| COUNT | DEFENDANT | DATE | AMOUNT | DESCRIPTION OF TRANSACTION |
|---|---|---|---|---|
| 11 | HOLDEN | 10/17/2008 | $20,000.00 | Purchase of Bank of America cashier's check No. 0012561 made payable to Chase Bank |
| 12 | HOLDEN | 11/12/2008 | $17,000.00 | Cash withdrawal from Gold Star Bio-Diesel LLC account No. X2701 at Bank of America. |
| 13 | SHARP HOLDEN | 11/12/2008 | $24,000.00 | Transfer from Gold Star Bio-Diesel LLC account No. X2701 at Bank of America to Clean Energy Association account No. X8034 at Bank of America. |
| 14 | SHARP | 11/12/2008 | $12,000.00 | Purchase of Bank of America cashier's check No. 1084149 made payable to J.L. |
| 15 | HOLDEN | 03/10/2009 | $93,500.00 | Wire transfer from Gold Star Bio-Diesel LLC account No. X2701 at Bank of America to Gold Star Bio-Diesel LLC account No. X0784 at JP Morgan Chase Bank. |
| 16 | HOLDEN | 03/11/2009 | $15,000.00 | Wire transfer to J.E.T. from Gold Star Bio-Diesel LLC, account No. X0784 at JP Morgan Chase Bank. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

### COUNT 17
### MONEY LAUNDERING CONSPIRACY
### [18 U.S.C. § 1956(h)]

1.  The Grand Jury re-alleges each and every allegation contained in each of the paragraphs of Counts 1 through 16 of this Indictment, and incorporates them by reference as if fully set forth herein.

2. From in or about approximately July 2007 and continuing until the date of this Indictment, in the District of Oregon and elsewhere, defendants **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN**, together with others known and unknown to the Grand Jury, did knowingly and unlawfully combine, conspire, confederate and agree with each other and with others known and unknown to the grand jury, to engage or attempt to engage in monetary transactions affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, namely the material mail and wire fraud scheme described in Counts 1 through 10 of this Indictment, more fully described above.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION
[18 U.S.C. §§ 1341, 1343 Proceeds]

1. The Grand Jury re-alleges each and every allegation contained in each of the paragraphs of Counts 1 through 17 of this Indictment, and incorporates them by reference as if fully set forth herein.

2. Upon conviction of one or more offenses alleged in Counts 2 through 10 of this Indictment, **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN** shall forfeit to the United States pursuant to 18 U.S.C. § 981 (a)(1)(c) and (D), and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations(s), including but not limited to, a sum of money representing the amount of proceeds obtained as a result of the offenses of Wire Fraud, in violation of Title 18 U.S.C. §1343 as alleged in the above-listed Counts 2 through 7, or Mail Fraud, in violation of Title 18 U.S.C. § 1341 as alleged in the above-listed Counts 8 through 10.

3. If any of the above-described forfeitable property, as a result of any act of omission of the defendant(s):

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be divided without difficulty;

It is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of **LLOYD BENTON SHARP**, aka Kevin Thomas, and **JACK HOLDEN** up to the value of the forfeitable property described above.

DATED this 24th day of September, 2013.

A TRUE BILL.

_____
OFFICIATING FOREPERSON

Presented by:

S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon

*/s/ Claire M. Fay*
CLAIRE M. FAY, DCB #358218
Assistant United States Attorney

INDICTMENT          Page 19